IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LILIYA TURUBCHUK, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 12-CV-594-SMY-SCW |
| | ) |
| E.T. SIMONDS CONSTRUCTION | ) |
| COMPANY, et al., | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM AND ORDER**

Pending before the Court is Defendant E.T. Simonds Construction Company's Amended Motion for Summary Judgment (Doc. 118). Plaintiffs filed a response (Doc. 157). For the following reasons, the motion is **DENIED**.

### **Background**

In 2007, Plaintiffs filed a negligence action in this court seeking to recover for injuries resulting from a single vehicle accident which occurred on August 21, 2005 ("the underlying action") (*see* Doc. 106-1; *see also Turubchuk v. E.T. Simonds Const. Co.*, 07-CV-216-WDS). Plaintiffs sued Defendants E.T. Simonds Construction Company ("ETS") and Southern Illinois Asphalt Company, Inc. ("SIAC"). Defendants were contractors on a State of Illinois road construction project (the "Project") who were involved in repaving a stretch of Interstate 24. At the time of the accident, Plaintiffs' vehicle was travelling eastbound on Interstate 24.

Plaintiffs alleged that the fog-line and yellow solid lines on the interstate had not been repainted after the repaving. In addition, a guardrail, which was in place to construction had been removed and that the vehicle in which they were riding left the paved road in the

1

construction zone, slipped off of a severe edge drop-off and rolled. Plaintiffs further alleged that Defendants were negligent by creating an unreasonably dangerous condition, failing to erect appropriate barricades and failing to warn vehicle operators of these hazards.

In 2004, the Illinois Department of Transportation ("IDOT") opened the bidding process for the Project. ETS and SIAC bid on the Project as a joint venture and were awarded the Project in July 2004. On August 23, 2004, ETS and SIAC executed a Joint Venture Agreement (the "Agreement") (Doc. 118-10). Under the terms of the Agreement, ETS was named the overall Project Manager with responsibility for the proper coordination, accounting and management of the Project. Each contractor presented their respective bids for the Project, assumed all responsibility for the accuracy of their respective bids and was responsible for the costs of its portion of the Project. Additionally, each contractor "severally assume[d] all obligations and responsibilities to IDOT" and agreed to indemnify and hold the other harmless for any breach of their respective obligations under the Project.

The Agreement further provides that ETS was "solely responsible" for the westbound lanes of the Project, while SIAC was "solely responsible" for the eastbound lanes; including testing, incentive payments/deductions, and any required corrective actions that may be imposed by IDOT. Each contractor was "free to conduct its respective business in whatever manner it [saw] fit" and neither contractor was "entitled to make nor be bound by any representations, actions, or liabilities whatsoever done by the other party."

The "joint venture" was responsible for obtaining general liability insurance required by the IDOT:

> "Such insurance shall be in the name of the joint venture, with ETS and SIAC as additional insured…Each respective Contractor shall indemnify and hold harmless the Joint Venture and their agents from and against all claims,

damages, losses, and expenses including attorney's fees arising out of or resulting from the performance of that Contractor's work (Doc. 118-10, p. 2).

On September 8, 2004, ETS and SIAC obtained general liability insurance on behalf of the "joint venture", issued by Bituminous Insurance Company, Policy CLP3216156 (Doc. 118-12). At the time of the accident, ETS and SIAC were also insured by several individual policies in addition to the Bituminous policy. ETS was individually insured by Zurich Commercial Umbrella Liability, Policy AUC 930332403 (policy limits $10,000,000) and another Bituminous policy, Policy CLP320823B (policy limits $1,000,000) (Docs. 106-8, 106-9). Similarly, SIAC was insured by: Liberty Mutual Insurance Company, Policy RG-2-631-004090-605 (policy limits $2,000,000); Clarendon National Insurance Company Excess (Umbrella) Liability Policy XLB00411049 (policy limits $2,000,000); Liberty International Underwriters Insurance Company, Excess Liability Policy LQ1-B71-073-091-051 (policy limits $25,000,000); and ACE American Insurance Company, Excess Liability Policy XCP G22082589 (policy limits $25,000,000) (Docs. 106-21 to 106-24).

Following the 2005 accident, ETS notified the Tedrick Group, its insurance broker (Doc. 106-10, pp. 32-38). In his deposition, Roger Tedrick testified that the Tedrick Group opened a claim because it was their policy to put the insurance company on notice following a fatality. *Id*. The accident was immediately reported to Bituminous. *Id*. After Plaintiffs filed the underlying action in 2007, the Tedrick Group notified ETS's umbrella coverage insurer, Zurich, of the claim because it implicated a potential policy limits case. *Id*.

Plaintiffs were represented in the underlying case by Komron Allahyari. On April 25, 2007, Richard Green entered his appearance for "Defendants E.T. Simonds Construction and Southern Illinois Asphalt Company, Inc., joint venture" (Doc. 118-37). On May 13 or 14, 2007, Allahyari and Green discussed the underlying action via telephone (Doc. 106-4). According to

3

Allahyari, during this conversation, Green affirmatively represented that Defendants were performing the repaving as a joint venture and that there was only one insurance policy, the Bituminous policy, with policy limits in the amount of $1,000,000 per occurrence. *Id*. Again, according to Allahyari, on May 14, 2007, he made a policy-limit settlement demand based on Green's representation that $1,000,000 represented the limits of all insurance policies applicable to the claims raised by Plaintiffs in the underlying action (Docs. 106-4, Doc. 106-15, 106-16, pp. 37-38).

Green emailed Allahyari Defendants' Rule 26(a)(1) disclosures on May 15, 2007 (Doc. 106-13). Section C of the disclosures state: "At the time of the occurrence the joint venture was insured by Bituminous Casualty Insurance Company with policy limits of $1,000,000, a copy of Certificate of Insurance is attached" (Doc. 106-5). No other insurance policies were identified and Defendants never amended their initial disclosures or provided any of their other insurance policies to the Plaintiffs in the underlying action (Doc. 106-14, 106-17).

In his deposition taken in this case, Green testified that he spoke with Bill Simonds, Mark Etters and another individual about the disclosures (Doc. 106-13, pp. 20-21). However, he did not inquire whether SIAC or ETS had any additional insurance policies (Doc. 106-14, pp. 27-28). His general practice was to identify all available insurance policies later in the discovery process after receiving interrogatories and a request to produce (Doc. 106-13, pp. 42-43). Bill Simonds, James Jones and Mark Etters of ETS testified during their depositions that they did not recall speaking with Green regarding the initial disclosures and that they never saw the disclosures (Doc. 102-4, pp. 118-119, Doc. 118-16, pp. 31-32, Doc. 118-17, pp. 38-39).

Plaintiffs' settled their claims for the Bituminous joint venture $1,000,000 policy limits (Doc. 106-17) and the case was dismissed at the parties' request following the Court's approval

4

of the minor settlement in February 2008 (*see Turubchuk v. E.T. Simonds Const.Co.*, 07-CV-216-WDS). During his deposition, Allahyari testified that he would have withdrawn the May 14, 2007 settlement demand had he known about the additional policies (Doc. 106-4, 106-16, p. 38).

Plaintiffs filed this action nearly six years later, seeking damages for Defendants' failure to disclose their individual policies. Plaintiffs maintain that if Defendants had disclosed the individual policies, they would not have settled for the "policy limits" of the only policy disclosed to them. Plaintiffs assert claims for intentional misrepresentation, fraudulent concealment, negligent misrepresentation and constructive fraud.

## Discussion

ETS contends that summary judgment is warranted on several grounds: (1) Plaintiffs' claims are barred pursuant to the Illinois litigation privilege; (2) Illinois does not recognize a cause of action for misconduct which occurred in prior litigation; (3) it is not liable for Richard Green's actions; (4) Plaintiffs' claims are barred by the effect of the release in the underlying action; (5) Plaintiffs cannot establish the necessary elements of their misrepresentation claims; and (6) ETS and SIAC were operating as a joint venture on the Project and its individual insurance policies would not have provided coverage in the underlying action.

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see also RuffinThompkins v. Experian Information Solutions, Inc.,* 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004). A moving party is entitled to

5

judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323.

**Absolute Litigation Privilege**

In Illinois, "[a]n attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding." *Atkinson v. Affronti*, 861 N.E.2d 251, 255 (2006). The absolute litigation privilege applies "only when the following conditions have been met: the publication was made in a judicial proceeding; had some connection or logical relation to the action; was made to achieve the objects of the litigation; and involved litigants or other participants authorized by law." *Kurczaba v. Pollock*, 742 N.E.2d 425, 438 (2000).

This privilege is limited to protection against defamation and false light actions, neither of which do Plaintiffs assert in the instant action. *See Zdeb v. Baxter Int'l, Inc.*, 697 N.E.2d 425, 429-30 (1998); *Scheib v. Grant*, 22 F.3d 149, 156 (7th Cir. 1994). ETS has cited no authority in support of its effort to utilize the litigation privilege as a shield to allegations of misrepresentation, fraud and concealment, and the Court is aware on none. The privilege does not apply and summary judgment is denied as to this point.

**Misconduct in Prior Litigation**

Relying on *Harris Trust and Savings Bank v. Phillips*, 506 N.E.2d 1370 (1987), SIAC asserts that there is no civil cause of action for the alleged "misconduct" that occurred in prior litigation. In *Harris Trust*, the plaintiff brought an action to recover costs and fees incurred in the retrial of an underlying action, alleging slander, defamation and intentional interference with

6

the judicial process. *Id*. at 1370. The court noted that the re-litigation expenses claimed did not constitute special damages within the law of defamation *per quod* because the plaintiff would have incurred the same expenses even if the defendant's words were not defamatory. The court further held that the expenses incurred in litigating the underlying action should not be the basis for the subsequent litigation because there is no civil cause of action for misconduct which occurred in the underlying case.

The *Harris Trust* holding is narrow and limited to claims for re-litigation expenses in instances where a plaintiff alleges defamation in an underlying case. There is no support for SIAC's contention that Plaintiffs claims are likewise precluded. On the other hand, courts have recognized a cause of action alleging fraud and misrepresentation for the concealment of evidence in underlying actions. *See*, e.g., *Williams v. BASF Catalysts LLC*, 765 F.3d 306 (3rd Cir. 2014); *Matsuura v. E.I. Dupont de Nemours & Co.*, 73 P.3d 687 (Haw. 2003). Accordingly, ETS's motion for summary judgment on this issue is also denied.

**Defendant's Liability for Attorney Richard Green's Actions**

Next, ETS argues that it is not bound by Green's actions. Generally, a party is bound by his or her attorney's actions or omissions during the course of the legal representation, including the attorneys' mistakes or negligence. *See Horwitz v. Holabird & Root,* 816 N.E.2d 272, 277 (2004); *Ameritech Publishing of Illinois, Inc. v. Hadyeh,* 839 N.E.2d 625 (2005). A litigant has a duty to follow his or her own case. *Id.* However, when an attorney acts pursuant to the exercise of independent professional judgment, he or she acts presumptively as an independent contractor whose intentional misconduct may generally not be imputed to the client, subject to factual exceptions. *Horwitz*, 816 N.E.2d at 278.

Where a plaintiff seeks to hold a client vicariously liable for the attorney's allegedly

intentional tortious conduct, they must prove facts demonstrating either that (1) that the client specifically directed, controlled or authorized the attorney's precise method of performing the work or (2) that the client subsequently ratified acts performed in the exercise of the attorney's independent judgment. *Id.* at 279. "A client ratifies the actions of his attorney by not repudiating the acts once he has knowledge of them, or by accepting the benefits of those acts. Ratification need not be express; it may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an allegedly unauthorized transaction." *Kulchawik v. Durabla Mfg. Co.,* 864 N.E.2d 744, 750 (2007) (internal citations and quotation marks omitted).

Here, Plaintiffs have alleged both intentional and negligent misrepresentation. Thus, ETS would be bound by any negligent conduct by Green in the underlying action. As to alleged intentional misrepresentations, there are material disputed facts preventing a summary determination.

ETS representatives testified that they did not recall speaking with Green about the intial disclosures and that they never saw the disclosures. However, Green testified that he spoke with ETS representatives regarding the disclosures. There are also questions of fact regarding whether ETS ratified Green's actions by failing to disclose its additional policies during the prolonged settlement period. The release in the underlying action was not executed until February 2009. Further, Plaintiffs assert that ETS, its insurance carriers and Green were aware of the proposed settlement and did not disclose the individual policies – even after ETS put its individual carrier on notice of the underlying action. Given the factual disputes regarding whether ETS knew and/or ratified Green's actions, summary judgment cannot be granted on this issue.

**Release in the Underlying Action**

ETS also argues that the Release in the underlying action bars Plaintiffs' lawsuit, citing *Adler v. William Blair & Co.,* 648 N.E.2d 226, 232 (1995). Specifically, ETS asserts that, pursuant to the terms of the Release, the parties agreed that they were not relying on any representations made by counsel, the other parties or their agents and were relying solely upon their own judgment and the advice of their own attorney.

In *Adler,* the plaintiffs brought suit against the defendant for common law and statutory fraud after they lost their investments in limited partnership interests in the defendant company. *Adler,* 648 N.E.2d at 228. The plaintiffs argued that they relied on oral misrepresentations that differed from the written representations provided to them. *Id.* at 231. The defendant filed a motion to dismiss the complaint for failure to state a cause of action, which was granted. *Id.* The appellate court affirmed, based on non-reliance language present in the private placement memorandum (PPM) that was given to prospective investors. *Adler,* 648 N.E.2d 234. The court noted that the plaintiffs were given PPMs that contained detailed information, including warnings that the investment carried a high degree of risk. *Id.* The plaintiffs were also required to sign subscription agreements that warranted that they had read the PPM and made the decision to invest based solely on the PPM and not in reliance on any other information. *Id.* The court held that under these circumstances, it was unreasonable for the plaintiffs to rely on oral representations that were directly contrary to statements in the written agreement. *Id.*

Here, the representations Plaintiffs allegedly relied on in agreeing to settle their claims were not *contrary* to any statements or disclosures they had been provided prior to settlement – Plaintiffs specifically claim that they relied on Green's oral representations and Defendants' Rule 26 initial disclosures.

Rule 26 required SIAC to disclose any insurance agreement that might cover all or a part of the judgment entered in the underlying case. Rule 26(a)(1)(A)(iv) provides in relevant part:

…a party must, without awaiting a discovery request, provide to the other parties:

(iv) …[A]ny insurance agreement under which any person carrying on an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgement. *See* Fed.R.Civ.P. 26(a)(1)(A)(iv).

Rule 26 was amended in 1970 to require the disclosure of insurance policies. The Advisory Committee Notes to the 1970 Amendments point out that "[d]isclosure of insurance coverage will enable counsel for both sides to make the same realistic appraisal of the case, so that settlement and litigation strategy are based on knowledge and not speculation." Fed.R.Civ.P. 26, 1970 adv. com. notes, subd. b(2) (the former location of current Rule 26(a)(1)(A)(iv)). The purpose of the inclusion of insurance policies is to "conduce settlement and avoid protracted litigation." *Id*. The Advisory Committee notes further observe that "information about coverage is available only from defendant or his insurer." *Id*. Disclosure is required when the insurer "may be liable" on part or all of the judgment. Similarly, the Advisory Committee's Notes to the 1993 Amendments to Rule 26 state that the initial disclosures serve to provide parties with certain "basic information," including the existence of insurance, which "is needed in most cases to prepare for trial ***or to make an informed decision about settlement***." Fed.R.Civ.P. 26, 1993 adv. com. notes (emphasis added).

Plaintiffs were entitled to rely on the truthfulness and accuracy of Defendant's legally required initial disclosures and the non-reliance language in the Release cannot be a defense to Plaintiffs' claims for misrepresentation, concealment or fraud. Accordingly, ETS's motion is denied on this point.

**Misrepresentations**

The elements of a cause of action for intentional or fraudulent misrepresentation are: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance. *Soules v. General Motors Corp.,* 402 N.E.2d 599 (1980). The elements of a cause of action for negligent misrepresentation are: (1) a false statement of material fact, (2) carelessness or negligence in ascertaining the truth of the statement by the party making it, (3) an intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statement, and (5) damage to the other party resulting from such reliance, (6) when the party making the statement is under a duty to communicate accurate information. *Fox Associates Inc. v. Robert Half International, Inc.,* 777 N.E.2d 603 (2002). The two claims differ only in the mental state required; for fraudulent misrepresentation, the defendant must know that the statement is false, while for negligent misrepresentation, the defendant need only be negligent in ascertaining the truth of the statement. *City of Chicago v. Michigan Beach Housing Co-op.,* 696 N.E.2d 804 (1998).

ETS challenges whether Plaintiffs' alleged reliance was justifiable. Plaintiffs argue that based on the undisputed material facts, Defendant's failure to disclose all insurance policies which may have been applicable to the underlying action constitutes negligent and/or intentional misrepresentation as a matter of the law. The Court disagrees.

Although Defendants failed to comply with the disclosure requirements of Rule 26,[1] there remain material issues of fact as to whether that failure constituted either intentional or negligent misrepresentation. Absent an admission by Defendants or direct evidence, whether in failing to disclose the individual insurance policies, Defendants intended to induce Plaintiffs to act –

---

[1] See the Court's Order at Doc. 199.

specifically, to settle for the $1,000,000 Bituminous policy limits – is a disputed fact for determination by the jury which may be established by circumstantial evidence. There are also disputed questions of fact regarding whether Plaintiffs acted in reliance on the misrepresentations in the Rule 26 disclosures. Plaintiffs contend that they acted in reliance on the false information in Defendants' disclosures and settled their claims for the policy limits of the only policy disclosed. ETS disagrees.

At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Credibility determinations, the weighing of evidence and the drawing of legitimate inferences from facts are jury functions.

Finally, whether and to what extent Plaintiffs were damaged due to Defendants' failure to disclose the additional policies is also a question of fact for the jury's determination. Therefore, a summary determination as to this issue cannot be made by the Court.

**ETS's Individual Policies**

Finally, ETS asserts that, during the Project, it was operating as a joint venture with SIAC and therefore, its individual policies would not have been applicable to Plaintiffs' claims because each policy contained "joint venture" exclusions. The policies in question include the following provisions:

### *Zurich Commercial Umbrella Policy*

Coverage B – Umbrella Liability Insurance

> Under Coverage B, we will pay on behalf of the insured, sums as damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of bodily injury…

Insured means:

A. You, if you are an organization shown in the Declarations, other than a partnership, joint venture or limited liability company…

B. You, if you are a partnership or joint venture shown in the Declarations…

No person or organization is an insured with respect to the conduct of any current, past or newly formed partnership, limited liability company or joint venture that is not designated with the Declarations of this policy as Named Insured…

(Doc. 118-36).

### *Bituminous Primary Policy*

Section II – Who is an Insured
1. If you are designated in the Declarations as:
   b. A partnership or joint venture, you are insured. Your members, you partners, and their spouses are also insureds, but only with respect to the conduct of your business…

With respect to the conduct of any past or present joint venture or partnership not shown as a Named Insured in the Declarations and which you are or were a partner or member, you, and others identified in items 1.a., 1.b., and 1.c., subject to the conditions and limitations contained therein, are insureds, but only with respect to liability arising out of "you work" on behalf of any partnership or joint venture not shown as a Named Insured in the Declarations, provided no other similar liability insurance is available to you for "your work" in connection with your interest in such partnership or joint venture.

A partnership or joint venture, not shown as a Named Insured in the Declarations, of which you have 33% or more ownership interest at the time of "bodily injury" or "property damage" caused by an "occurrence" or "personal and advertising injury" caused by an offense, is an insured, provided that no other similar liability insurance is available to that partnership or joint venture.

(Doc. 118-33).

Under Illinois law, a "joint venture" is simply defined as "an association of two or more persons to carry out a single enterprise for profit." *Groark v. Thorleif Larsen & Son, Inc.,* 596 N.E.2d 78, 81 (1992). To determine the parties' intent to form a joint venture, the court must find each of the following factors: (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint ventures; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill or

knowledge; (4) a degree of joint proprietorship or mutual right to the exercise of control over the enterprise; and (5) provision for joint sharing of profit and losses." *Trustmark Ins. Co. v. Gen. & Cologne Life Re of America,* 424 F.3d 542, 547 (7th Cir. 2005) (citing *Minyo v. Minyo,* 581 N.E.2d 170, 173 (1991)). In the absence of any of the five elements, no joint venture exists. *O'Brien v. Cacciatore,* 591 N.E.2d 1384, 1389 (1992). The burden of proving the existence of a joint venture is on the person who claims such a relationship exists. *Id.* Ordinarily, the question of whether a joint venture exists is a question for the trier of fact. *Id.* But, if there are no material issues of fact appropriate for jury determination, the issue, is subject to summary disposition.

ETS, relying almost exclusively on the language of the Joint Venture Agreement, asserts that the undisputed material facts establish as a matter of law that they formed a joint venture to complete the Project. First, ETS points out that they bid on the Project as a joint venture, were awarded the project as a joint venture and entered into a Joint Venture Agreement to establish the parameters of their respective work. Defendants maintain that they both contributed resources, skill and manpower necessary for completion of the Project.

Notwithstanding these facts and an express agreement between ETS and SIAC to carry on "an enterprise with a common interest," the evidence relating to the degree of joint proprietorship and mutual right to exercise control over the enterprise does not support the existence of a joint venture under Illinois law.

The right to control requires some right by the parties to direct and govern the conduct of each other in connection with the joint venture. *Edward Hines Lumber Co. v. Vulcan Materials Co.,* 861 F.2d 155, 158 (7th Cir. 1988). When examining this element, Courts consider "whether the parties manage their own affairs separately, whether they appoint persons to management

14

positions within the joint venture, whether they control the methods or policies used by each other, whether they exert or attempt to exert control over the work of the joint venture, and whether any right to control is one-sided rather than mutual." *Quadro Enter., Inc. v. Avery Dennison Corp.,* 2000 WL 1029176, at *7 (N.D. Ill. 2000); s*ee also*, *Barton v. Evanston Hosp.,* 513 N.E.2d 65, 67 (1987) (determining whether the parties exerted a "right to direct and govern the policy and the conduct of the other in connection with the joint venture" is paramount to a joint venture analysis); *O'Brien,* 591 N.E.2d at 1388–89; *Clapp v. JMK.Skewer, Inc.,* 484 N.E.2d 918, 920–21 (1985)

In this case, the Joint Venture Agreement specifically states that each contractor "shall be free to conduct its respective business in whatever manner it sees fit and that neither shall be entitled to make nor be bound by any representations, actions or liabilities whatsoever done by the other party." It further provides that each contractor was responsible for a set of lanes – ETS was "solely responsible" for the westbound lanes, while SIAC was "solely responsible" for the eastbound lanes. Both contractors were "solely responsible" for the mainline pavement that each installed on the Project, including "testing, incentive payments/deductions, and any required corrective actions that maybe imposed by the Illinois Department of Transportation." Finally, each contractor "severally assume[d] all obligations and responsibilities to the Illinois Department of Transportation."

In spite of Defendants' contentions to the contrary, in the absence of any other facts in the record that would demonstrate that they conducted themselves inconsistent with the terms of the Agreement, Defendants managed their Project related affairs separately, had no control over the methods or policies used by the other in performing their portion of the Project and did not have the ability to exert control over the work of the other. As such, the Court concludes that as

a matter of law, a joint venture did not exist between ETS and SIAC with respect to the Project and the aforementioned individual policies would have afforded coverage for the claims in the underlying action. Defendant's motion is denied on this point.[2]

## Conclusion

For the foregoing reasons, Defendant E.T. Simonds Construction Company's amended motion for summary judgment is denied in its entirety.

**IT IS SO ORDERED.**

**DATED: February 3, 2017**

                                              **s/ Staci M. Yandle**
                                              **STACI M. YANDLE**
                                              **United States District Judge**

---

[2] The Court granted summary judgment in Plaintiff's favor on this issue on January 31, 2017 (Doc. 199).